**George Gregory KORKALA, Plaintiff,**

v.

**W.W. NORTON & COMPANY, Publisher, Starling Lawrence, in his capacity as Editor, and Patrick Brogan and Albert Zarca, individually, and in their capacity as Authors, Defendants.**

**No. 84 Civ. 6142 (RLC).**

United States District Court, S.D. New York.

Aug. 13, 1985.

George Gregory Korkala, pro se.

Botein, Hays & Sklar, New York City, for defendants; Richard Cashman, Nancy F. Brodie, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff George Gregory Korkala brought this libel action *pro se* against the publisher, editor, and authors of *Deadly Business*, a non-fiction book concerning the international arms trade. Specifically, Korkala claims to have been injured in his reputation and livelihood by chapter 19, pages 346–353 of the book. The case is before the court on defendant's motion for summary judgment.

FACTS

*Deadly Business* introduces Korkala, along with ex-CIA agent Frank Terpil, as "New York gunrunners" (p. 346), and describes the two men as having attempted to sell 10,000 machine guns and other weapons to two undercover police officers posing as Latin American revolutionaries. The book details a November 15, 1979 meeting between Korkala and the "revolutionaries," at which Korkala is described as saying that he could provide the "revolutionaries" with a great variety of guns, silencers, laser sights, grenades, explosives of all sorts, and even surface-to-air missiles. At a second meeting, on November 16, Terpil allegedly joined Korkala and the "revolutionaries," and "the four men got down to business" (p. 347).

According to the book, Terpil arranged for the "revolutionaries" to inspect a store of automatic weapons (which actually belonged to another, legitimate arms dealer in Great Britain), and, after the inspection, the "revolutionaries" paid Terpil a $56,000 deposit. Two nights later, the book reports, Korkala, Terpil and the "revolutionaries" met at a New York hotel. There was a knock at the door; the police

"rushed in, guns drawn. Terpil pulled out a revolver but did not use it. Terpil, Korkala, and a third partner, [sic] were arrested" (p. 351).

The book also describes a raid by New Jersey police on the headquarters of the Amstech Corporation in Nutley, New Jersey. Amstech, the book explains, "was George Korkala's export company, though it is probable that the real owner was Frank Terpil" (p. 352). There, the book reports, the police discovered "an arsenal ... consisting of briefcase bombs, letter bombs, dozens of firearms, grenades, a ballpoint pen designed to fire poison darts, liquid explosives, a rifle with a night telescope suitable for assassinations, poisons, and a lighter and pen that could be assembled to form a pistol" (*id.*).

The book states that Korkala and Terpil spent "a few days" in jail, and then were released on bail "over the vehement protests of the police" after posting $15,000 bond each (p. 352). The two were due to stand trial in September, 1980, the book reports, "but a few days earlier, just as the prosecutors had feared, they fled the country. They were tried *in absentia* in June, 1981, and Terpil was sentenced to the maximum penalty of seventeen and a half to fifty-three years in jail. Terpil has not been seen since, but Korkala was arrested in Spain in 1982 and extradited" (p. 353).

In an April 22, 1984 letter to the book's editor, Korkala specifies the parts of *Deadly Business* that he considers libelous. He complains that he and Terpil learned of the two "revolutionaries" through a lawyer, and not by word on the street, as alleged in the book; that the guns sold to the "revolutionaries" were French MAT–49s and not British stens; that Amstech is owned entirely by Korkala and not at all by Terpil; that none of the items listed as having been found at the raid on Amstech were actually found; that Terpil was not armed when arrested; that the arrest was in the morning rather than the evening; that the police raids were not "simultaneous" as alleged;[1]

and that Terpil was arrested a second time at a "restricted exhibit for the Secret Service" and not at a "trade fair for the security industry," as the book puts it.

In his answer to defendants' interrogatories, Korkala drops some of these claims and adds a few more. He complains that the book has the date of his meeting with Terpil and the "revolutionaries" wrong; that the list of items seized at Amstech is inaccurate; that Korkala, not Terpil, owns Amstech; that Korkala spent two weeks, not "a few days," in jail before release on bail; that bail was $100,000, not $15,000; that he did not flee, but rather departed, the country; and that the description of his December 22, 1979 arrest is inaccurate.

DISCUSSION

The defendants urge the court to grant summary judgment or to dismiss on six independent grounds—the statements complained of are substantially true, they are fair reports of judicial proceedings, collateral estoppel bars plaintiff's claim, plaintiff may not assert a claim on behalf of Amstech, plaintiff is libel-proof, and the suit is "frivolous and malicious" under 28 U.S.C. § 1915.

█ Most of Korkala's complaints may be disposed of without even reaching defendants' arguments. Under the common law, for a communication to be libelous, it must not only be false but also damaging. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559. *See also* W. Prosser, The Law of Torts, § 111 at 739 (4th ed. 1971). This is the law, in particular, in New York, *e.g., Morrison v. National Broadcasting Co.*, 19 N.Y.2d 453, 458, 280 N.Y.S.2d 641, 644, 227 N.E.2d 572 (1967), and in New Jersey, *e.g., Maressa v. New Jersey Monthly*, 89 N.J. 176, 445 A.2d 376

---

1. Actually, a close reading of chapter 19 reveals that only the Great Britain raid, and not the New Jersey one, is alleged to have been simultaneous with the arrest.

(1982), the two states whose law could govern this action.[2]

■ With two possible exceptions, the statements specified by Korkala, even if false, simply do not harm his reputation. A reader would have no better impression of Korkala even if his version of the truth were substituted for the author's. Especially in light of the main allegations made about Korkala in *Deadly Business*, it simply does not matter if he were arrested at a different time of day, or if the guns he tried to sell were British and not French, or if his bail were $100,000 and not $15,000. Korkala has failed to state a claim; assuming *arguendo* that the complained of statements are inaccurate, they are not damaging, and therefore they are not actionable.

This conclusion is particularly apt in the instant case, where Korkala has admitted the truth of the main charges made by *Deadly Business* —that he is a gunrunner; that he was arrested with Frank Terpil for illegally selling weapons to persons believed to be Latin American revolutionaries; that he was not in the United States for his trial; and that he was tried and convicted *in absentia*. Korkala has admitted *each* of these allegations in his response to defendants' Request for Admissions. *See* Admissions 1–9. Moreover, on June 8, 1984,[3] Korkala pleaded guilty in New York State Supreme Court, New York County, to four counts of indictment growing out of the events described in *Deadly Business*. Specifically, Korkala admitted that between November 15, 1979, and December 22, 1979, he knowingly offered for sale 10,000 machine guns, knowingly possessed a firearm silencer, attempted to possess an explosive substance, and criminally possessed a loaded firearm. *See* Transcript at 8–9.

■ Under the common law in general, and the law of New York and New Jersey

in particular, truth is an absolute defense to a claim of libel, and it is not necessary that every detail be accurate. *See, e.g.,* Restatement (Second) of Torts § 581A comment f (at 237) ("[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance"). The question is "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934). *See also Hermann v. Newark Morning Ledger Co.,* 138 A.2d 61, 67 (N.J.Super.Ct., App.Div.1958) ("[t]he rule is that a false statement in the publication which is immaterial to, or does not go to the gist or sting of the libel does not render an otherwise true statement defamatory"). Here, the substance—the "gist" or "sting"—of *Deadly Business* is admitted by Korkala to be true, and his only complaints are about peripheral and immaterial matters. These complaints cannot sustain a libel suit.

■ Two of the complained of statements, however, may be considered damaging and not inconsequential. First, the book asserts that Korkala fled the country before his trial. This clearly is harmful to reputation, and Korkala claims it is false. Korkala admits, however, that he failed to appear in court for his trial date, but rather left the country and forfeited bail (Admissions 5–7). In light of this admission, plaintiff's claim that the statement is false is simply facetious. Plaintiff may not consider his admission an admission of flight from prosecution. The court does.

■ Second, Korkala claims that his ability to earn a livelihood has been damaged by the false assertion that Amstech is probably owned by Terpil and not by Korkala. The court is not entirely satisfied that this statement can be considered damaging.

**2.** Plaintiff is a New Jersey resident, currently incarcerated in New York. Defendants' place of business is in New York. The court need not decide which state's law governs the case because both states' laws are in accord on all relevant points.

**3.** Spain extradited Korkala in 1982 on condition that he would receive a new trial in the United States. Korkala pleaded guilty at this new trial.

The book links Amstech with an illegal gunrunning scheme; one would expect Korkala to be pleased to have ownership of the allegedly illicit corporation—and responsibility for its activities—imputed to another, and would not consider such imputation damaging.

■ But even assuming the statement is damaging (and false), it is not actionable. That is because the reference to Amstech as "George Korkala's export company, though it is probable that the real owner is Frank Terpil" is an expression of opinion, and expressions of opinion are constitutionally protected. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974); *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 223 (2d Cir.1985).

■ The determination of whether a specific statement is one of fact or one of opinion is a question of law for the court. *Davis v. Ross*, 754 F.2d 80, 85 (2d Cir.1985). The inquiry must be made from the perspective of an "ordinary reader," *Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977). Beyond that, in this circuit, there is no precise test to apply, *Mr. Chow of New York v. Ste. Jour Azur S.A.*, *supra*, 759 F.2d at 225–26, though Second Circuit case law does provide some guidance. *Id.*

One important consideration is to "look at the language itself to determine if it is used in a precise, literal manner or in a loose, figurative or hyperbolic sense." *Id.* at 226, *citing Cianci v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir.1980) and *Buckley v. Littell*, *supra*, 539 F.2d at 893–94. In this case, the authors did not declare literally and unconditionally that Amstech is owned by Terpil and not by Korkala. On the contrary, the authors acknowledged that Amstech is "George Korkala's company," but they added their suspicion that "it is probable that the real owner is Frank Terpil." The ordinary reader would not understand the phrase "real owner" in this context to mean the person whose name literally appears on the company's official documents, but rather—in a looser sense—the person who is really the power behind Amstech, the person who is really in control. The authors were expressing their opinion, based on the nature of the relationship between Korkala and Terpil described in chapter 19, that Terpil probably held the reins at Amstech. Such a statement of opinion is constitutionally privileged. *See Wynberg v. National Enquirer, Inc.*, 564 F.Supp. 924, 926 (C.D.Cal. 1982) (statement, "I suspect the real total [of money plaintiff improperly obtained from Elizabeth Taylor] was even more" than the amount made public held to be "an expression of [the author's] feeling which is not defamatory").

In light of the foregoing, it is not necessary for the court to reach defendants' other arguments. The motion for summary judgment is granted.

IT IS SO ORDERED.